No. 82-50

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

LARRY WILLIAMS,

Plaintiff and Appellant,

vs.

JAMES PASMA,

Defendant and Respondent.

Appeal from:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable William J. Speare, Judge presiding.

Counsel of Record:

For Appellant:

Gerald J. Neely argued, Billings, Montana

For Respondent:

Herron, Meloy and Llewellyn, Helena, Montana
Peter M. Meloy argued, Helena, Montana

Submitted:  November 15, 1982

Decided:  December 29, 1982

Filed: DEC 29 1982

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Plaintiff/appellant, Larry Williams, filed a complaint in the Thirteenth Judicial District, Yellowstone County, against defendant/respondent, James Pasma, claiming libel and asking for damages. On January 8, 1982, the District Court granted summary judgment to Pasma. Williams appeals.

The alleged libel was prompted by an occurrence of events which began in October 1979. At that time there was "talk" that Superintendant of Public Instruction, Georgia Ruth Rice, would be opposed by a former employee, Judi Fenton. On October 24, 1979, Kenneth Dunham, Secretary to the State Republican Committee, made a critical comment about both Rice and Fenton which was carried by the Great Falls Tribune. In the same edition of the Tribune there was another story announcing that unsuccessful U.S. Senate candidate Williams and former Governor Tim Babcock had been selected and agreed to head a John Connally for President committee.

When Pasma, a member of the State Democratic Committee, read the two news reports, he found it ironic the republicans were criticizing the two potential democratic candidates while at the same time they announced the appointment of two individuals (Williams and Babcock) who had had "trouble with the law" to run Connally's campaign committee. Pasma then composed a press release which was printed in the Great Falls Tribune on October 27, 1979. Pasma stated, "The entire thrust of my article was for Mr. Dunham to busy himself cleaning up his own house rather than attacking unannounced democratic candidates and delving or messing around in any way in the democratic primary." The press release stated:

> "A Democratic Party official Friday accused state Republican spokesman Ken Dunham of making statements about Democrats that were 'short on content and long on poor taste and bad manners.'

> "Democratic national committeeman Jim Pasma, Havre, took issue with comments Dunham made

this week about Public Instruction Supt. Georgia Ruth Rice and her possible Democratic opponent, Judi Fenton. Rice also is a Democrat.

"Dunham had questioned Rice's competency and said he was disturbed that Democrats would consider nominating 'another bureaucrat' like Fenton for the job.

"Pasma called Dunham's comments 'typical of the traditional negative chatter that comes from the Republican state office.' He said Dunham's press releases, which included a 'vicious personal attack' on Rice and 'an equally unbecoming media salvo' against Fenton 'may very well set the tone for the type of campaign rhetoric we can expect from the GOP in 1980.'

"Pasma said it was ironic that on the same day that Dunham attacked the Democrats, a story ran indicating that former Republican Gov. Tim Babcock and Larry Williams, unsuccessful 1978 GOP Senate candidate, were among the leaders of a state committee promoting the presidential candidate John Connally.

"'When we consider that all three have at one time or another been under federal indictment for political and financial shenanigans, it is small wonder to me at least that Ken Dunham busies himself calling attention to what he considers the shortcomings of possible Democratic opponents, Pasma said.'

"Connally, a former Democratic governor of Texas, was acquitted of charges that he was bribed by milk producers when he was secretary of the treasury. Babcock pleaded guilty and was fined for making an illegal campaign contribution to former President Richard Nixon. Williams was stripped of his licenses as an investor and commodity adviser, but a court ruled in his favor and his licenses have been returned.

"Pasma urged Dunham to spend his time making sure the Republicans come up with their best qualified candidate for superintendent to insure a healthy debate of the issues in the general election."

Pasma's misconception about Williams evolved from an article which appeared in Forbes Magazine and was reprinted in the Billings Gazette. The article contained the following statement:

"Court records show that Williams was three times charged with violations of federal regulations covering commodities and security investment counselors."

Pasma claims he did not know the difference between "charged with a federal offense" and "being under federal indictment."

- 3 -

In a story which appeared in the Great Falls Tribune on October 30, 1979, Williams demanded a retraction from Pasma. Williams stated Pasma's charges that Williams had been under federal indictment were false and constituted "dirty politics" and he would file a libel suit if a formal retraction was not made. Williams said, "Somebody has to teach political people in Montana to play the game by the facts and by the truth, and if that happens to be me, so be it."

In a telephone interview after Williams demanded a retraction, Pasma stated: "If Mr. Williams says he wasn't indicted, then I have no choice but to believe him unless someone informed me otherwise." This statement was published in the Great Falls Tribune on October 30, 1979. Pasma further admitted that "his use of the words 'federal indictment' in a press release 'apparently was a poor one.'" In an interview published in the Great Falls Tribune on December 11, 1979, Pasma stated, "At the time I made the statement that Mr. Williams had been federally indicted, as had former Governor Babcock and former Governor Connally, I sincerely believed it, . . . talking to Mr. Williams by phone he assured me that this was incorrect and as I said in a previous news release, I believe him."

After Pasma refused to make a formal retraction, Williams filed a complaint in Yellowstone County against Pasma alleging that he had been libeled and suffered damages by virtue of the article published in the Great Falls Tribune. Pasma moved to dismiss the action claiming Williams was a "public figure" and therefore in order for Williams to recover he must allege and prove actual malice. Before the District Court acted on the motion to dismiss, Williams amended his complaint charging Pasma with actual malice. On January 8, 1982, following cross-motions for summary judgment, the District Court granted Pasma's motion and ordered judgment be entered in favor of Pasma. Williams appeals.

The substance of the issues raised on appeal is as follows:

1. Whether the District Court erred by granting summary judgment which held Williams is a public figure as a matter of law.

2. Whether there is any genuine issue as to any material fact affecting Williams' allegations that Pasma acted with malice, and if not, is there any factual basis upon which a jury could conclude that the statements were made with malice.

3. Whether the state and federal rules protecting freedom of speech and press in libel actions apply to a nonmedia defendant.

4. Whether the defenses of "belief in the truth" and "fair comment" were properly pleaded and if so, whether these defenses and the privileges contained in section 27-1-804, MCA, apply in this action.

Williams contends summary judgment was inappropriate claiming the issue of whether or not he was a public figure is for the jury to determine. Williams cites Article II, Section 7, 1972 Montana Constitution:

> "In all suits and prosecutions for libel or slander the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the facts."

In support of his position, Williams relies upon the following language from Madison v. Yunker (1978), 180 Mont. 54, 589 P.2d 126:

> "Likewise it may be contended in the retrial that Madison is a 'public figure.' Whatever his status, it is a question for the jury to determine, because of the constitutional provision that the jury under the instructions of the court is the judge of both law and fact. Article II, Section 7, 1972 Montana Constitution. With appropriate instructions, the jury can determine these matters and their status in any trial, unless otherwise stipulated." 589 P.2d at 133.

However, this language is not controlling and must be qualified. In Griffin v. Opinion Publishing Co. (1943), 114 Mont. 502, 138 P.2d 580, this Court correctly stated:

> "While our Constitution like that of Missouri, Colorado, South Dakota and Wyoming provides that in libel suits 'the jury, under the direction of the court, shall determine the

law and the facts,' yet the decisions clearly show that the function of the court and jury is not greatly different in the trial of libel from what it is in other cases.

"In other words, it is for the court and not the jury to pass upon demurrers to the complaint; upon the admissibility of the evidence; upon motions for nonsuit; upon motions for a directed verdict; upon motions for a new trial and upon motions to set aside verdicts or vacate judgments." 114 Mont. at 512.

Thus, there is no absolute prohibition against granting summary judgment in libel cases. As the United States Supreme Court commented in Roseblatt v. Baer (1966), 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597: "we remark only that, as in the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.'"

Next, we must decide whether the District Court was correct in finding Williams was a public figure as a matter of law. If Williams was a public figure at the time of the alleged libel, then he cannot recover damages unless he can show the statement was made with actual malice. This rule was stated by the United States Supreme Court in New York Times v. Sullivan (1964), 376 U.S. 254, 279-280, 84 S.Ct. 710, 11 L.Ed.2d 686:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' - that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

For a period of time the United States Supreme Court differentiated between public officials and public figures. See Curtis Publishing Co. v. Butts (1967), 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094. Finally, in Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789, the United States Supreme Court removed the distinction and classified public figures as falling into one of two groups:

"In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in

> all contexts. More commonly, an individual
> voluntarily injects himself or is drawn into a
> particular public controversy and thereby
> becomes a public figure for a limited range of
> issues. In either case such persons assume
> special prominence in the resolution of public
> questions."

In this instance, if Williams falls into either of the above-mentioned groups, it would most likely be the former. Obviously, there is a limited number who can be included in the group of public figures for all purposes. In Gertz the United States Supreme Court stated:

> "Absent clear evidence of general fame or
> notoriety in the community, and pervasive
> involvement in the affairs of society, an
> individual should not be deemed a public per-
> sonality for all aspects of his life." 418
> U.S. at 352.

We must determine here whether there is clear evidence that Williams had "general fame or notoriety in the community" and exhibited "pervasive involvement in the affairs of society."

Prior to the time of the alleged libel Williams had: published an investment advisory service and traded in stocks and commodities; authored three books on stocks and commodities; been the subject of an article in Forbes Magazine in 1975 and an article in the Wall Street Journal in 1976, and gave a speech to an economic conference in Los Angeles; unsuccessfully ran for the position of United States Senator for the State of Montana in 1978; attended a republican party convention in 1979 and gave a speech; served as chairman for the Montana republican party; and been an active member of the National Taxpayer's Union. Some courts have hinted that national notoriety is necessary to attain general public figure status. See, Swatsler, The Evolution of the Public Figure Doctrine in Defamation Actions, 41 Ohio St. L.J. 1009, 1030 (1980). However, we cannot find any authority from the United States Supreme Court nor State Supreme Court cases that expressly sets such a requirement. In fact, the language "in the community" appears to require only local notoriety. We find the above-mentioned activities do establish clear evidence that Williams had general fame or notoriety in the

community (Montana) and exhibited pervasive involvement in the affairs of society and thus was a public figure as a matter of law.

In view of our finding that Williams was a public figure as a matter of law, we must determine whether the District Court erred in holding there is no factual basis upon which a jury could conclude Pasma's statements were made with malice. As stated above, the rule that a public official cannot recover damages upon a claim for defamation without a showing of actual malice was stated in New York Times v. Sullivan, supra. There, the United States Supreme Court held malice must be proved by a showing that the statement was published "with knowledge that it was false or with reckless disregard of whether it was false or not."

In New York Times the alleged libel stemmed from a full page advertisement published in the New York Times which spoke of alleged human rights infractions by the police department in Montgomery, Alabama. About whether there was a showing that the publication was made with malice, the United States Supreme Court stated:

> "The statement does not indicate malice at the time of the publication; even if the adver- tisement was not 'substantially correct' - although respondent's own proofs tend to show that it was - that opinion was at least a reasonable one, and there was no evidence to impeach the witness' good faith in holding it." 376 U.S. at 286.

We find here, as in New York Times, that the statement was made in good faith and although it was not a correct statement, there is simply no evidence the statement was made with actual malice. The difference between the legal words "indicted" or "charged" is relatively minor in the minds of the average Montana citizen and Pasma stated he did not know there was a difference. Pasma's statements to the press which were published after the alleged libel surely abdicate any allegation the statement was made with actual malice: "At the time I made the statement that Mr. Williams had been federally indicted . . . I sincerely

- 8 -

believed it, . . . talking to Mr. Williams by phone he assured me that this was incorrect and as I said in a previous news release, I believe him."

Williams next argues the First Amendment privilege established by New York Times does not apply because Pasma is a nonmedia defendant. The New York Times privilege evolved from the United States Supreme Court's recognition of the need for far-reaching First Amendment protection in certain cases. The United States Supreme Court stated:

> "Such a privilege for criticism of official conduct is appropriately analogous to the protection accorded a public official when he is sued for libel by a private citizen . . . The reason for the official privilege is said to be the threat of damage suits would otherwise 'inhibit the fearless, vigorous, and effective administration of government' and 'dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.' [citation omitted] Analogous considerations support the privilege for the citizen-critic of government. It is as much his duty to criticize as it is the official's duty to administer." 376 U.S. at 282.

This privilege was expanded to include matters involving all public figures. The United States Supreme Court did not limit its extension to only media defendants in Gertz, supra. We agree with the holding of the Oregon Supreme Court in Wheeler v. Green (1979), _____ Ore. _____, 593 P.2d 777:

> "There is, however, nothing in Gertz which suggests that the cases applying the New York Times rule to non-media defendants were incorrect or would not be followed in future actions brought by public official or public figures. The Court's concern in those cases to provide adequate protection for freedom of public debate on issues of public importance has not been repudiated. We conclude that all defendants, not only those associated with the media, continue to be protected by the New York Times rule in cases involving comment upon public officials and public figures." 593 P.2d at 784.

This holding is consistent with this Court's ruling in Gallagher v. Johnson (1980), _____ Mont. _____, 611 P.2d 613, 37 St.Rep. 940. In Gallagher we held the New York Times rule applied to a nonmedia defendant who purchased advertising space

- 9 -

in a local newspaper to vent his criticisms of, and frustrations with, the government for the city of Anaconda, Montana.

Williams' last assertion is that the defenses of "belief in the truth" and "fair comment" were not properly pleaded and that the statutory privileges contained in section 27-1-804, MCA, are not available in this action. The defenses of "belief in the truth" and "fair comment" were common law privileges which led to the United States Supreme Court's ruling in New York Times, v. Sullivan, supra. A close reading of New York Times reveals that the common law privilege of fair comment was the privilege which the United States Supreme Court was addressing when it stated: "Thus we must consider this case against the background of a profound national commitment to the principal that debate on public issues should be uninhibited, robust, and wide open, . . ." 376 U.S. at 270. The common law privilege of belief in the truth was similarly incorporated into the New York Times rule as going to the proof of actual malice. As these privileges were incorporated into the rule set forth in New York Times, there is no longer a requirement that they be pled as specific defenses or lost. Throughout the course of this action, Pasma maintained Williams was a public figure and there was no evidence that the statement was made with actual malice. This is all the defense Pasma was required to plead.

We find no need to comment upon Williams' contention that the privileges contained in section 27-1-804, MCA, are not applicable here. We have already applied the New York Times rule and its extensions to the facts of this case. In so doing, we find Williams was a public figure at the time of Pasma's statement and there is no evidence that the statement was made with actual malice. Judgment of the District Court is affirmed.

_John Conway Harrison_
Justice

- 10 -

We concur:

_____
Chief Justice

_____
Daniel J. Shea
_____
Justices

Mr. Chief Justice Frank I. Haswell, dissenting:

I would vacate the summary judgment and remand to the District Court for further proceedings.

The lynchpin of the majority opinion is that plaintiff Larry Williams is a public figure for all purposes as a matter of law. I disagree. In my view, this is a jury question precluding summary judgment.

In a libel action the jury, under the direction of the court, determines the law and the facts. Art. II, Sec. 7, 1972 Mont. Const. We have previously held that a person's status as a public figure is a question for the jury to determine. Madison v. Yunker (1978), 180 Mont. 54, 66, 589 P.2d 126, 133. The majority now limit Madison to cases where there is a genuine issue of material fact for the jury to determine. I agree.

My quarrel is with the majority conclusion that there is no jury question in this case. In my view, there is a genuine issue of material fact as to whether plaintiff Larry Williams is a public figure for all purposes which fore-closes summary judgment.

The substance of the uncontested evidence of record in this case discloses the following facts relating to Williams' status as a public figure at the time of the alleged libel (October 27, 1979):

(1) Williams was an unsuccessful candidate for United States Senator in 1978 and in connection therewith made numerous speeches, issued press releases, appeared on TV, and made numerous public appearances in connection with his campaign;

(2) Williams authored three books on stocks and

commodities prior to 1978;

(3) Williams published an investment advisory service and traded in stock and commodities;

(4) Williams and others were selected to be members of the State Committee for Republican presidential candidate John Connally;

(5) Williams was the subject of an article in Forbes magazine in 1975 and the Wall Street Journal in 1976;

(6) Williams gave a speech to an Economic Conference in Los Angeles;

(7) Williams attended a Republican convention and gave a speech for a candidate for State Republican Chairman;

(8) Williams was a member of the National Taxpayers Union and gave testimony to a legislative committee and worked at the legislative level, made a public statement promoting balanced budgets, and issued three press releases during the legislative session.

Do these uncontested facts make Williams an all-purpose public figure as a matter of law? Not at all. To establish such there must be "clear evidence of general fame or notoriety in the community, and persuasive involvement in the affairs of society." Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323, 352, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789, 812. It has been held by a federal appeals court that "a person can be a general public figure only if he is a 'celebrity'--his name is a 'household word'--whose ideas and actions the public in fact follows with great interest." Waldbaum v. Fairchild Publications, Inc. (D.C. Cir. 1980), 627 F.2d 1287, 1292, cert. denied, 449 U.S. 898, 101 S.Ct. 266, 62 L.Ed.2d 128. Examples of persons the courts have

held to be all-purpose public figures are Johnny Carson [Carson v. Allied News Co. (7th Cir. 1976), 529 F.2d 206] and William F. Buckley, Jr. [Buckley v. Littell (2nd Cir. 1976), 539 F.2d 882, cert. denied, 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777]. Measured by these standards, isn't there at least a jury question as to whether Larry Williams qualifies as an all-purpose public figure? Is Williams a celebrity whose name is a household word and whose ideas and actions the public follows with great interest? There is no evidence that the general public is even aware of his many publications and activities. Nor is there evidence of the impact of his activities on the public.

It is equally important to note other facts disclosed by the record:

(1) Williams was not a public official;

(2) Williams did not inject himself into the Pasma-Dunham controversy that gave rise to the alleged libel;

(3) Prior to the alleged libel, Williams had not served as an officer of the Republican Party, was not involved in promoting placement of Initiative 86 on the ballot, and was not involved in any activity in connection with the John Connally campaign.

A party opposing summary judgment is entitled to the benefit of all inferences that may reasonably be drawn from the offered proof. Mally v. Asanovich (1967), 145 Mont. 99, 105, 423 P.2d 294, 297. A case should never be withdrawn from the jury unless it appears, as a matter of law, that a recovery cannot be had upon any view of the facts which the evidence reasonably tends to establish. Miller Insurance Agency v. Home Fire Etc. Ins. Co. (1935), 100 Mont. 551,

-14-

561, 51 P.2d 628, 630. Such is not the case here. The summary judgment should be vacated and the case should proceed to jury trial.

_____
                  Chief Justice